PINE BLUFF COMPRESS & WAREHOUSE COMPANY *v.*
ANDREWS.

Opinion delivered October 14, 1929.

*Coleman & Gantt*, for appellant.

*Wooldridge & Wooldridge*, for appellee.

SMITH, J. Appellant company is engaged in the business of compressing and storing cotton for hire at its compress and warehouse in the eastern portion of the city of Pine Bluff, and in the month of April, 1927, appellee had several hundred bales of cotton stored in one of the warehouses. The plant was in two parts, each having a capacity of about twenty thousand bales of unpressed

cotton. One of these, known as the upper warehouse, was designed for the reception of cotton shipped over railroads, and its floors were on a higher level than those of the other, which was known as the lower warehouse. Each plant consisted of several different sheds, having separate numbers. There were about eight thousand bales of cotton in the lower warehouse, and something less than that number in the upper.

In April of the year mentioned there began what later proved to be the most disastrous flood known in that section, and on April 13 flood warnings were sent out by the United States Weather Bureau. The Federal Government maintains at Little Rock a weather bureau, in charge of H. S. Cole, who has general supervision of the meteorological, climatological and river work in the State of Arkansas, where records are made and kept of the rainfall, and the rise and fall of the rivers, and other related subjects. There is a substation at Pine Bluff and at other places in the State, which make daily reports to the Little Rock office, and receive daily reports from it. A Miss Scheu was in charge of the Pine Bluff office. The reports to which we have referred were made by wire, or were made in that manner during the time herein referred to, and were so made for the obvious purpose of communicating the information without delay.

On April 13, 1927, at 10 A. M., flood warnings for the Arkansas River, on which Pine Bluff is situated, were telegraphed to Miss Scheu for dissemination in the territory served by that office. This warning meant simply that the crest of the river would exceed the flood stage, which was defined to be the flood level at which the river left its banks, and began to do some damage. It is an annual event for the river to exceed its flood stage, which of itself causes no apprehension, as most of the territory subject to this damage had what was supposed to be protection by levees. Other territory was supposed to be above the reach of the floods, and such was the land upon which appellant's warehouses were located. No overflow had ever reached them prior to 1927. These

flood warnings were renewed during the succeeding days, and accompanying them were reports on the stage of the river at points higher up than Pine Bluff, which excited general alarm, but the managing officers of appellant company thought the elevation of the ground upon which their plant was located was such that a sufficient margin of safety was assured. Prior to 1927 the highest flood stage of the river at Pine Bluff had been 29.6 feet, but on the 21st of April a stage of 32.4 feet was reached. A stage of 31 feet was reached on Monday, April 18, and this flood level was high enough to put water in the lower warehouse, and the cotton which had not been removed from it prior to that time was damaged on that account. Appellee had 137 bales of cotton in this warehouse, which was damaged, and this suit was brought to recover damages to compensate this loss. A judgment was recovered, from which is this appeal. No question is made as to the amount of the recovery if there is liability, but it is very earnestly insisted that appellant is not liable at all, for the reason that the loss was occasioned by an act of God, which could not have been averted by ordinary care and diligence on appellant's part.

From what we have said it is apparent that the flood did not come suddenly and unexpectedly, as in the case of a break of a levee which was thought to be secure. There were repeated warnings, and the question of fact in the case is whether, after such warnings were given as must have apprised appellant that its warehouse was in danger, proper diligence was thereafter used to remove the cotton to the upper warehouse, a place of safety.

The court gave elaborate instructions defining the duty of the appellant under the circumstances, which are conceded to be substantially correct, and which we find to be so, although it is claimed that one of these instructions should have been modified in the manner hereafter discussed, and that another instruction, numbered 4, should not have been given, because it left out of consideration the question of time in which to remove the cotton after knowing it was in danger. It is also insisted that

error was committed in refusing to exclude certain parts of a deposition taken in appellee's behalf. These assignments of error will be considered in the order stated.

In regard to the assignment of error that the testimony does not show any negligence on the part of appellant, the following facts may be stated in addition to those already recited:

Miss Scheu testified that upon receipt of the reports from Little Rock she furnished copies thereof to the daily papers in Pine Bluff, which published them, and that these reports excited the widest interest, and her telephone rang continuously for three days, and she was kept busy answering inquiries concerning the river. It is not contended that appellant was unaware of the situation; on the contrary, it is stipulated that the officials of the company kept up with the stage of the river every day from the 11th of April to the 21st, inclusive. The insistence is that it was not until Friday, the 15th, that these reports became sufficiently ominous to suggest that such an unprecedented stage would be reached as would put water in the lower warehouse; and it is further insisted that, when this report was received, appellant exercised the greatest diligence to remove the cotton to the upper warehouse.

Appellee testified that on April 11 he discussed the river reports with Mr. Roane, the secretary of the appellant company, and advised him that if the river reached the stage at Pine Bluff which the reports from points higher up the river indicated it would do, the cotton in the lower warehouse would be flooded, and that Mr. Roane replied that he would notify Mr. Grant, the superintendent in charge of the plant. Mr. Roane denied that this conversation occurred.

The testimony is to the effect that the predictions of the weather bureau were not always verified, but that they were generally approximately correct; sometimes the predicted stages were exceeded, while in other years they were not. The factor entering into this equation was the continuance or cessation of rainfall; but a rainfall of 4.2

inches at Pine Bluff on April 15 gave no promise that the predictions would not be verified as to the maximum stages. The rise at Pine Bluff from the 12th to the 21st was rapid and constant, and on the 15th the river went above the flood stage at Pine Bluff, which is 25 feet.

Hale, a civil engineer, testified on behalf of appellant. This witness was familiar with the surface levels at the warehouses, and of the flood levels of the river. He, with many others, was observing the reports concerning the river, and he testified that Friday, the 15th, was the earliest day on which there was any occasion to be alarmed at Pine Bluff, but he admitted that between the 13th and 14th the river rose 6 feet at Dardanelle, and reached a stage of 26.4 at that place on the 14th, and was continuing to rise there. He also testified that at that stage from three to four days were required for the water to flow from Dardanelle to Pine Bluff.

The testimony is conflicting as to the time when appellant began moving the cotton. It was necessary that the cotton in the upper warehouse be rearranged to receive that from the lower, and this was first done. The testimony on the part of appellant is to the effect that the work was begun on Friday, while on appellee's behalf it is to the effect that the work was not begun until Saturday. When the work was first begun, from twenty to thirty men were employed, but the number was increased until finally about one hundred men were engaged when the work was suspended about 4 P. M. Sunday. An abundance of labor was available. After the work of removing the cotton started, it was prosecuted diligently until it was suspended Sunday afternoon. The testimony is conflicting as to why it was then suspended, that on the part of appellee being to the effect that Mr. Grant, the superintendent, said the crest of the flood had been reached, and that an additional rise was not anticipated. The gauge then stood at 29.5 feet, and there was a rise of a foot and a half that night, and during the night the water entered the lower warehouse. On behalf of appellant it was denied that the work was suspended, because it was thought

the crest of the flood had passed, and appellant's officers stated that the reason for so doing was that the men had become exhausted, and it was thought that a suspension would renew the efficiency of the laborers, and that the work was resumed very early Monday morning and continued without interruption until about 3 P. M. Tuesday, when the water had become so deep, and the current so swift, that it was not then safe to attempt to even float the cotton. A large number of witnesses gave testimony elaborating the facts herein recited, which we do not further review, as we have stated the salient points. These, we think, show that there was a question for the jury as to whether appellant began removing the cotton as early as ordinary care would have suggested, and employed from the beginning the necessary help to accomplish that purpose. When the work was suspended Sunday afternoon the cotton was being moved at the rate of from 160 to 200 bales per hour, and when the work was finally suspended only 200 or 300 bales remained in the lower warehouse, and appellee's cotton was a part of that number.

The court gave, at appellee's request, an instruction numbered 2, which reads as follows:

"If you believe from a preponderance of the evidence in this case that the flood waters from the Arkansas River, which reached the defendant's warehouse in the eastern part of the city of Pine Bluff, during the month of April, 1927, and damaged any cotton which plaintiff had stored therein, was the result of an act of God, still this would not relieve the defendant of liability, if you further find from a preponderance of the evidence that the damage to plaintiff's cotton, if any, was caused by the combined effect of an act of God, and the concurring negligence, if any, of the defendant."

Appellant requested that this instruction be modified by adding the following words: "and that without such negligence said damage would not have occurred."

This modification might well have been made, as it is, of course, the law that appellant would not be liable unless it were negligent, and this negligence was an effi-

cient cause of the damage, without which the loss would not have been sustained. But the instruction does not ignore or controvert that proposition. It required that the finding that the damage was caused by the combined effect of an act of God, and the concurring negligence of appellant, before any recovery could be had. Other instructions given at the request of appellant as well as those on behalf of appellee elaborated this requirement to the extent that the jury could have been under no misapprehension on this subject. Indeed, the court gave, at appellant's request, an instruction numbered 9, dealing with this phase of the case alone, which reads as follows:

"Unless you find that the defendant was negligent, and that such negligence was the direct cause of the injury and damage to plaintiff's cotton, the burden of proving which rests upon the plaintiff, you will find for the defendant."

Instruction numbered 4, which was objected to as leaving out of consideration the question of time within which to remove the cotton, reads as follows:

"Even though you may find from the evidence in this case that the flood waters from the Arkansas River which reached the defendant's warehouse in the eastern part of the city of Pine Bluff, during the month of April, 1927, resulted from an act of God, this would not relieve the defendant of responsibility if, by the exercise of ordinary care and diligence, it could have removed the cotton which plaintiff had stored in defendant's warehouse to a place where it would not have been reached by the flood waters, and if you find that defendant failed to exercise such care and the plaintiff's cotton was thereby damaged, you will find for the plaintiff."

We do not think the instruction is open to the objection made. It deals with the separate ground of alleged negligence that, even when it was certainly known that the water would enter the lower warehouse, there was negligence in failing to promptly remove the cotton. Liability might have been predicated upon that issue, and

we think the instruction a correct declaration of the law on that subject.

The deposition of A. R. Stone was read at the trial. Stone had been the plant foreman, and as such had supervision of the moving of the cotton. He resided in Texas at the time of the trial, and his deposition was taken on interrogatories. In answer to interrogatory No. 11 he made the following response:

"A. 11. No, the flood waters of the Arkansas River did not reach into the upper warehouses of the plant during the 1927 flood. *I am sure that it was apparent to the officials of the Pine Bluff Compress & Warehouse Company that these flood waters were going to reach the plant, and especially all of the lower warehouses, and damage or carry away the cotton which we had stored there, if it were not removed;* because Mr. Grant, the manager of the warehouse company, discussed with me the matter several days prior to Easter Sunday, and had told me it was necessary that we clear the lower warehouses; and on Saturday, part of Saturday night, and on Easter Sunday, the day following that Saturday, we were busy, with extra help, moving the cotton out of the lower warehouses into the upper warehouses. The flood warnings which had been issued, as well as the conditions and the information we had with reference to the river, were discussed by Mr. Grant and myself several times, *and we had every reason to believe that the flood waters would reach into our lower warehouses.* We of course also knew that, if the waters of the river came in contact with the cotton which we had stored there, it would be lost, destroyed or damaged."

A motion was made to strike out the portion of the answer appearing in italics, upon the ground that this part of the answer was argumentative and opinionative, and undertook, not only to state the opinion of the witness himself, but that of Mr. Grant as well.

We do not think the answer is open to the objection made to it. Appellee was endeavoring to show, as a ground upon which to predicate the charge of negligence, that the managing officers of the appellant company, a

corporation, knew, or should have known, that the flood waters were going to reach the plant, and, having this knowledge, failed to exercise due care to protect the cotton. That they finally had this knowledge is an undisputed fact; but to support a recovery of damages it was necessary to show that these officers had, or, in the exercise of ordinary care, should have had, this information in time thereafter, by due diligence, to have removed the cotton. It was competent therefore for appellee to show that Mr. Grant had this information, and the time when he obtained it. The effect of the answer set out above is to show that Grant had this information, and the witness so stated, not as a matter of opinion but as a matter of fact, known so to be by the witness after discussing this very question with Mr. Grant. We think therefore, that no error was committed in refusing to exclude this testimony.

As no error appears from a consideration of the record in its entirety, the judgment is affirmed.